1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   MARISSA HARRIS (NYBN 4763025)
    Assistant United States Attorney
5
    MICHAEL J. SONGER (DCBN 975029)
6   Trial Attorney, Civil Rights Division

7        150 Almaden Boulevard, Suite 900
         San Jose, California 95113
8        Telephone: (408) 535-5061
         FAX: (408) 535-5066
9        marissa.harris@usdoj.gov
         michael.songer@usdoj.gov
10
    Attorneys for United States of America
11
                      UNITED STATES DISTRICT COURT
12
                   NORTHERN DISTRICT OF CALIFORNIA
13
                         SAN JOSE DIVISION
14

15  UNITED STATES OF AMERICA,            )  CASE NO. 20-CR-00432 EJD
                                         )
16         Plaintiff,                    )  GOVERNMENT'S OPPOSITION TO
                                         )  DEFENDANT'S MOTION FOR
17     v.                                )  RECONSIDERATION OF DETENTION ORDER
                                         )
18  OLE HOUGEN,                          )  Hon. Virginia DeMarchi
                                         )  Hearing Date: January 27, 2021
19         Defendant.                    )  Hearing Time: 1:00 p.m.
                                         )
20

21

22

23

24

25

26

27

28

OPP. TO MOTION FOR RECONSIDERATION

# TABLE OF CONTENTS

I.   BACKGROUND ....................................................................................................................1

    A.   OFFENSE CONDUCT AND INDICTMENT ...............................................................1

II.  DETENTION PROCEEDINGS..............................................................................................3

III. ARGUMENT.........................................................................................................................4

    A.   LEGAL STANDARDS..............................................................................................4

    B.   HOUGEN REMAINS A FLIGHT RISK AND A DANGER TO THE
        COMMUNITY ..........................................................................................................5

    C.   COVID-19 IS NOT A COMPELLING REASON FOR HOUGEN'S
        RELEASE ..................................................................................................................9

IV.  CONCLUSION....................................................................................................................13

1

# <u>TABLE OF AUTHORITIES</u>

2

*United States v. Hir,*
   517 F.3d 1081, 1088 (9th Cir. 2008)..................................................................... 8
3
*United States v. Diaz-Hernandez,*
   943 F.3d 1196 (9th Cir. 2019) ........................................................................ 5, 9
4
*United States v. Kidder,*
   869 F.2d 1328 (9th Cir. 1989) .............................................................. 10, 11, 12
5
*United States v. Motamedi,*
   767 F.2d 1403 (9th Cir. 1985) ............................................................................ 4
6
*United States v. Wages,*
   271 F. App'x 726 (10th Cir. 2008)...................................................................... 9
7
*United States v. Winsor,*
   785 F.2d 755 (9th Cir. 1986) .............................................................................. 5
8

9

Statutes

10

18 U.S.C. § 249(a)(1) ...............................................................................................1, 3
11
18 U.S.C. § 3142 ............................................................................................................ 1
12
18 U.S.C. § 3142(e)(1).................................................................................................. 4
18 U.S.C. § 3142(f)........................................................................................................ 5
13
18 U.S.C. § 3142(f)(2)(B).............................................................................................. 4
18 U.S.C. § 3142(g)........................................................................................................ 5
14
California Penal Code § 148(a)(1)................................................................................ 3
California Penal Code § 242 ......................................................................................... 3
15
California Penal Code § 417(a)(1)................................................................................ 2
California Penal Code § 422 ......................................................................................... 3
16
California Penal Code § 422.6(a) ................................................................................. 3

17

Other Authorities

18

*Money v. Pritzker,*
19   2020 WL 182  (N.D. Ill. Apr. 10, 2020)........................................................... 12
*United States v. Phillips,*
20   No. 20-CR-00099-JST-1, ECF No. 29 (N.D. Cal. Apr. 13, 2020)..................... 5
*United States v. Cazares,*
21   18-CR-00466 BLF-1, ECF No. 351 (N.D. Cal. Apr. 23, 2020) ........................ 8
*United States v. Crenshaw,*
22   No. 20-CR-00015 JD, ECF No. 28 (N.D. Cal. Apr. 18, 2020)......................... 8
*United States v. Batiste,*
23   16-CR-00278 CRB (JCS), ECF No. 63 (N.D. Cal. Mar. 27, 2020).................. 8
*United States v. Sanchez,*
24   No 19-CR-00576 VC (JSC), ECF No. 23 (N.D. Cal. Mar. 19, 2020)............... 8
*Plata v. Newsom et al.,*
25   No. 01-CV-01351 JST, ECF No. 3291 at 14 (N.D. Cal. Apr. 17, 2020)............10, 11, 12
26

27

28

1    The United States of America opposes Defendant Ole Hougen's January 13, 2021 Motion for

2    Reconsideration of Detention.  The Court has already found Hougen—who has 22 prior convictions for

3    violent offenses and minimal ties to the local community—to be both a flight risk and a danger to the

4    community and ordered Hougen detained pursuant to 18 U.S.C. § 3142.  Hougen does not contest these

5    findings.  Rather, he asks this Court to reopen his detention hearing under § 3142(f), citing COVID-19

6    as new information that has a material bearing on his risk of flight and risk to the safety of others.

7    Hougen's arguments ignore the governing legal standards and have no limiting principle.  Despite the

8    pandemic, individuals posing a danger to the community and a flight risk under the Bail Reform Act

9    should not be released en masse, but evaluated on a case-by-case basis.  Because Hougen remains a

10   flight risk and significant danger to the community, and because there is no other compelling reason for

11   release, this Court should deny his Motion.

12   **I.    BACKGROUND**

13        **A.    OFFENSE CONDUCT AND INDICTMENT**

14        On November 17, 2020, a federal grand jury in the Northern District of California returned an

15   indictment charging the defendant, Ole Hougen, with a hate crime, in violation of 18 U.S.C. § 249(a)(1),

16   based on a racially-motivated knife attack against a black man in Santa Cruz, CA.  Hougen was

17   originally charged by criminal complaint on September 29, 2020, after the Assistant Attorney General

18   certified that the prosecution was in the public interest and necessary to secure substantial justice.  The

19   Affidavit in support of the Complaint alleges that Hougen confronted the victim and swung a knife at

20   him approximately ten times while repeatedly calling the victim a "nigger."  Three bystanders who

21   witnessed the attack agreed that Hougen was the aggressor.  Two of them immediately called 911 to

22   report Hougen's attack.  Police who responded to the scene reported that Hougen continued to use racial

23   and ethnic slurs after being taken into custody.

24        Hougen has a lengthy history of racially-motivated violence.  The Complaint Affidavit describes

25   three prior convictions arising from incidents in which Hougen attacked black men with a weapon while

26   using racial slurs.  The first incident was in 2014 at the Mary Isaak Center, a homeless shelter in

27   Petaluma, California.  Hougen and the victim, a black man, were both eating lunch at the shelter.

28   Hougen approached the victim, called him a "nigger" and demanded to know why he was sitting with

1   white people.  The victim ignored Hougen and finished his meal. When he got up to dispose of his lunch

2   tray and leave, Hougen confronted him with a knife in his hand, called him a "nigger" again, and

3   attempted to goad him into a physical fight.  The victim defended himself until witnesses intervened to

4   subdue Hougen.  Hougen was arrested and charged with brandishing a knife, violation of civil rights by

5   force or threat, and violation of probation.  He pleaded no contest and was convicted for brandishing the

6   knife, a misdemeanor in violation of California Penal Code § 417(a)(1), and sentenced to 30 days in jail.

7          The second incident was in April 2018 and occurred on an Amtrak train traveling in Klikitat

8   County, Washington.  Hougen threatened to stab a black passenger and a black Amtrak employee after

9   calling them both "nigger."  Hougen was restrained by passengers and train employees until officers

10  arrived at the train depot.  Hougen also threatened to kill his arresting officer and continued screaming

11  curses, threats, and racial slurs in the officer's presence as he was being escorted off the train.  Hougen

12  was later convicted of malicious harassment, a felony, along with misdemeanor assault and harassment

13  charges for this conduct.  He was sentenced to 30 days in jail.

14         The third incident happened in December 2018 in Redding, California.  A police officer was

15  driving on South Market Street approaching Lincoln Avenue, when he witnessed a crowd gathered

16  around two men fighting with bloody faces: Hougen and the victim, a black man.  The officer pulled

17  over and had Hougen and the victim sit on the curb until backup arrived.  While they were sitting on the

18  curb, Hougen screamed out "Fuck you, nigger! I'll fucking kill you!" while spitting blood everywhere.

19  The officer went to his patrol car to get rubber gloves and Hougen got up and started approaching the

20  victim in a fast and aggressive manner, while continuing to call him a "nigger" and threatening to kill

21  him.  The officer then tackled Hougen and put him in handcuffs.

22         While on the ground in handcuffs, Hougen continued to scream at the victim, calling him a

23  "nigger" and threatening to "kick his ass" and "fuck him up."  Police put Hougen in the patrol car and

24  interviewed the victim, who said that he was picking oranges when Hougen came up to him and said

25  "Hey you fucking nigger, what are you doing?  Breaking into buildings or trying to steal shit from

26  around here?"  The victim did not know Hougen and had never spoken to him before. The victim told

27  Hougen to "fuck off," and Hougen then picked up two large rocks the size of baseballs and threatened to

28  "smash" and "kill" him with the rocks.  Hougen advanced on the victim, dropped the rocks, and punched

1   him in the face, causing his mouth to bleed.  After the victim tried to walk away, Hougen approached

2   him again and started screaming more threats and racial slurs at him and punched him again repeatedly.

3   The victim fought back in self-defense and then the officer arrived in the patrol car.

4   Hougen was totally uncooperative when the officer tried to interview him.  Instead, he kept

5   cursing, screaming racial slurs at the victim and threatening to kill him.  The victim believed that

6   Hougen attacked him because of his race.  Hougen later pleaded guilty and was convicted for making

7   terroristic threats, in violation of California Penal Code § 422, violation of civil rights by force or threat,

8   in violation of California Penal Code § 422.6(a), obstruction of a police officer, in violation of

9   California Penal Code § 148(a)(1), and battery, in violation of California Penal Code § 242—all

10  misdemeanors.  In January 2019, he was sentenced to three years of probation and 90 days jail.  Hougen

11  was still on probation for this hate crime incident when he attacked S.B. in Santa Cruz in July 2020.

12  Hougen was transferred to federal custody on October 16, 2020 and made his initial appearance

13  on October 19, 2020.  On November 2, 2020, the Court held a preliminary hearing and determined that

14  the Complaint was supported by probable cause.  On November 17, 2020, a grand jury returned an

15  Indictment charging Hougen with one count of using a dangerous weapon in a willful attempt to cause

16  bodily injury because of race, in violation of 18 U.S.C. § 249(a)(1).

17  **II.   DETENTION PROCEEDINGS**

18  On November 5, 2020, the Honorable Virginia DeMarchi held a remote hearing on the

19  government's detention motion via Zoom.  The government's arguments highlighted the defendant's

20  extensive and violent criminal history, his numerous failures to appear, failures on probation, active

21  arrest warrants, and total lack of any bail resources that would mitigate his dangerousness or risk of

22  flight.  Pretrial Services also recommended the defendant be detained as a danger to the community and

23  a risk of flight.  Specifically, the bail study prepared by Pretrial Services revealed that Hougen has:

24  - 22 convictions for violent offenses;

25  - 7 convictions for obstruction or threats to law enforcement;

26  - 4 convictions for failure to appear;

27  - 4 active arrest warrants, including two active warrants for failure to appear;

28  - 15 recorded failure to appear or failure to comply incidents;

OPP. TO MOTION FOR RECONSIDERATION

1   • No job, no home, no sureties, and no financial resources.

2   *See* Pretrial Services Report dated November 4, 2020.  The government further argued that Hougen

3   presents a specific danger to black members of the community.  Hougen's July 2020 attack against S.B.

4   represents his fourth known violent attack on black men in the last six years.  Three of these violent

5   attacks have happened within the last three years.  He was convicted of an actual hate crime after the

6   December 2018 incident in Redding, and was on probation for that offense when he attacked S.B. in

7   Santa Cruz.  The government has interviewed several victims and witnesses associated with these

8   racially-motivated attacks, and all of them indicated that Hougen's behavior was shocking, violent, and

9   traumatic.

10      After hearing arguments from both parties, Magistrate Judge DeMarchi ordered Hougen detained

11  based on her finding that no condition or combination of conditions would reasonably assure both the

12  defendant's appearance as required or the safety of any other person and the community.  After Judge

13  DeMarchi made her ruling, Hougen became verbally combative and had to be muted in order for the

14  proceedings to continue.

15  **III.   ARGUMENT**

16      **A.   LEGAL STANDARDS**

17      The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no

18  condition or combination of conditions will reasonably assure the appearance of the person as required

19  and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  Detention is

20  appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to

21  prove both.  *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  A finding that a defendant

22  is a danger to the community must be supported by clear and convincing evidence.  18 U.S.C.

23  § 3142(f)(2)(B).  A finding that a defendant is a flight risk need only be supported by a preponderance of

24  the evidence.  *Motamedi*, 767 F.2d at 1406.

25      The Court must consider four factors in determining whether the pretrial detention standard is

26  met:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the

27  defendant; (3) the history and characteristics of the defendant, including the defendant's character,

28  physical and mental condition, family and community ties, past conduct, history relating to drug or

OPP. TO MOTION FOR RECONSIDERATION

4

1   alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as

2   whether the crime was committed while the defendant was on probation or parole; and (4) the nature and

3   seriousness of the danger to any person or to the community that would be posed by the defendant's

4   release.  18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).  "[T]he Bail

5   Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in

6   § 3142(g)."  *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019).  Categorical

7   grants or denials of bail, not tethered to an individualized determination, are impermissible.  *Id*.

8   Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored.  *Id*.

9        Pursuant to 18 U.S.C. § 3142(f), a detention hearing may be reopened "if the judicial officer

10   finds that information exists that was not known to the movant at the time of the hearing and that has a

11   material bearing on the issue whether there are conditions of release that will reasonably assure the

12   appearance of such person as required and the safety of any other person and the community."

13   18 U.S.C. § 3142(f).

14        **B.    HOUGEN REMAINS A FLIGHT RISK AND A DANGER TO THE
              COMMUNITY**

15

16        On November 5, 2020, the Court rightly found that Hougen is a danger to the community and a

17   flight risk.  No new facts have emerged to seriously challenge those findings.  Rather, Hougen claims

18   that his risk of contracting COVID-19 at Santa Rita Jail presents changed circumstances now warranting

19   his release.  *See* ECF No. 46 at 4-6.  He also claims that his potential admission to a residential drug

20   treatment program could assure the safety of the community and his appearance in court.  *See id*. at 4.

21   However, his criminal history and past performance on supervision and pretrial release makes crystal

22   clear that he is not amenable to community supervision, regularly fails to appear for court, does not

23   respect authority, and has committed violence against other shelter program participants in the past.  The

24   COVID-19 pandemic does not meaningfully shift the balance of the § 3142(g) factors in Hougen's

25   favor.  *See, e.g.*, *United States v. Phillips*, No. 20-CR-00099-JST-1, ECF No. 29 (N.D. Cal. Apr. 13,

26   2020) (rejecting motion for release under § 3142(i) and inability to prepare defense due to COVID-19

27   because the existence and spread of COVID-19 did nothing to undermine the Court's previous findings

28   that defendant presents a danger to the community).

OPP. TO MOTION FOR RECONSIDERATION

### 1.     Hougen remains a flight risk

Section 3142(e) is primarily concerned with reasonably assuring the appearance of the defendant so that the judicial proceedings may proceed. Nothing about the COVID-19 pandemic changes Hougen's incentives to flee and evade supervision as he has done in the past and continues to do. As discussed above, Hougen currently has four active arrest warrants, four prior convictions for failure to appear, and fifteen prior failure to appear or failure to comply incidents in his record. Given this history, his cursory and self-serving statement that he will "comply with all conditions imposed by the Court," ECF No. 46 at 4, is simply not credible in the absence of any surety, cash, or asset with moral or financial suasion to ensure his compliance. Moreover, Hougen is—right now—not in compliance with orders from courts in Salem, Oregon and Beaverton, Oregon to appear for further proceedings and is wanted in Crook County, Oregon for violations of his state probation terms.

Hougen remains subject to significant penalties upon conviction. Indeed, Hougen's belief—articulated in his motion for bail—that institutional living enhances one's risk for becoming infected with COVID-19 and other illnesses suggests that, if anything, his incentives to avoid prosecution have grown stronger. If convicted for the charged federal offense, he faces a statutory maximum sentence of 10 years in federal prison. His conduct in the instant case likely also violated his California state probation, imposed in 2019 after the Redding incident, and he may face further prosecution or incarceration from the state of California based on those violations. Finally, given the four active warrants for his arrest in Oregon, he may face further prosecution, supervision, or incarceration from those authorities as well. As such, Hougen has every incentive to flee in order to avoid accountability for his conduct. He has done so numerous times in the past and will do so again if the Court releases him now.

### 2.     Hougen remains a danger to others

Although the world is different because of the current COVID-19 pandemic emergency, Hougen unquestionably remains a serious danger to others—police and civilian alike. This Court has already found that Hougen poses a danger to the community and there is no basis to disturb that finding. As discussed above, Hougen has amassed 22 prior convictions for violent offenses, to include assault, battery, threats against law enforcement, malicious harassment, brandishing deadly weapons, making

OPP. TO MOTION FOR RECONSIDERATION

terroristic threats, and violation of civil rights by force.  Indeed, the hate crime charged in the present indictment was committed in July 2020, long after the danger from the virus was well-known and shelter-in place and social distancing mandates were in effect.  Neither these mandates nor the risk of contracting the virus deterred Hougen from screaming racial slurs at a total stranger and attacking him with a knife, while on state probation for another hate crime.

As the Court is well aware, releasing dangerous defendants prematurely can have dire consequences.[1]  Not only does Hougen present the same danger to the community as he did at the time of the Court's prior ruling, but the community itself is more vulnerable to such danger given the tremendous stress that the pandemic and the current political climate has placed on civil society in recent weeks.  In this context, Hougen's history of violent behavior towards law enforcement and minorities is extremely concerning.  Simply put, this Court should not release a defendant with a history of violent attacks on minorities and law enforcement officers two weeks after a shocking and deadly insurrection committed by violent white supremacists and extremists against the U.S. Capitol and all of the public officials and police occupying the building at the time.  Federal and state governments remain on high alert based on credible threats of terroristic violence by individuals and groups that subscribe to violent racist ideology.[2]  While it is unclear whether Hougen associates with such groups or individuals, it is clear that he shares their beliefs and has acted upon them in the past with devastating effects on the random black victims that he has threatened and attacked.

It is unfair to ask the black community to shoulder the risk of further racially-motivated violence by this man.  It is unthinkable to expect any black patients or staff at Hougen's proposed residential drug treatment program to reside and work under the constant threat of racial violence.  Furthermore, the threat of a violent encounter between Hougen and other patients or staff is not a remote one: he was convicted for similar threats and attacks against a black man eating lunch at a homeless shelter, a black passenger riding on a train, a black Amtrak employee, and several police officers that previously

---

[1] *See* https://www.cnn.com/2020/04/14/us/man-released-jail-coronavirus-arrested-trnd/index.html (noting a defendant in Florida was released and then arrested two days later for second degree murder).

[2] *See* https://www.cnn.com/2021/01/15/us/capitol-insurrection-threat-states/ (noting ongoing national and local threats from violent right wing extremists and white supremacists in the wake of the deadly insurrection and the Capitol).

OPP. TO MOTION FOR RECONSIDERATION

arrested him.  And while Santa Rita Jail personnel have training, experience, and capacity to deal with violent outbreaks, the medical and clinical staff at the drug treatment center may not.

Moreover, because of the COVID-19 pandemic, Hougen's irresponsible social habits will likely endanger the health of the community if he is released.  *United States v. Hir*, 517 F.3d 1081, 1088 (9th Cir. 2008) (holding that "community," within the meaning of 18 U.S.C. § 3142, is not necessarily confined to local geography).  The entire state of California is currently ordered to shelter in place and "heed the current State public health directives," indefinitely, to avoid the spread of COVID-19. California Executive Order N-33-20, available at https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf (issued March 19, 2020, modified May 4, 2020).  Such rules, though enforced by peace officers, rely largely on voluntary obedience.  A person who ignores public health admonitions and rules could increase infection rates, leading to severe illness and death.  Hougen has shown an unwillingness or inability to follow rules and a disregard for the welfare of others.  His failure to follow rules poses additional dangers to the community.  Moreover, Hougen has been in continuous state and federal custody since his arrest in July 2020.  Releasing Hougen from his detention, and adding him back into the general population, is antithetical to the concept of sheltering-in-place, especially if he was already exposed to COVID-19 while incarcerated and may be an asymptomatic carrier.

There are no conditions or combination of conditions that reasonably mitigate Hougen's risk of flight or dangerousness to the community.  Accordingly, this Court should deny Hougen's Motion for release, just as numerous judges in this district have denied similar motions for pretrial release based on COVID-19, including those brought by dangerous defendants with underlying medical conditions.  *See, e.g.*, *United States v. Cazares*, 18-CR-00466 BLF-1, ECF No. 351 (N.D. Cal. Apr. 23, 2020) (written order revoking magistrate judge's release based on dangerousness where COVID-19 did not pose special risk to defendant); *United States v. Crenshaw*, No. 20-CR-00015 JD, ECF No. 28 (N.D. Cal. Apr. 18, 2020) (oral order revoking magistrate judge's release order pursuant to § 3142(i) for a defendant with asthma); *United States v. Batiste*, 16-CR-00278 CRB (JCS), ECF No. 63 (N.D. Cal. Mar. 27, 2020) (oral order denying motion for release based on COVID-19 of defendant with heart and lung damage on the basis of danger, insufficient information regarding medical condition and inadequate release plan); *United States v. Sanchez*, No 19-CR-00576 VC (JSC), ECF No. 23 (N.D. Cal. Mar. 19,

OPP. TO MOTION FOR RECONSIDERATION

1  2020) (oral order denying motion for release of defendant on the basis of danger and rejecting proposal

2  that he live with mother because he had previously been living with them while committing his

3  offenses).

4        **C.**    **COVID-19 IS NOT A COMPELLING REASON FOR HOUGEN'S RELEASE**

5        Unquestionably, the COVID-19 pandemic is a public health emergency. But Hougen has not

6  demonstrated that these circumstances apply to him in a manner that warrants temporary or permanent

7  release from custody. *See Diaz-Hernandez*, 943 F.3d at 1199 (forbidding "categorical grant of bail"

8  based on immigration detainer, and requiring individualized evaluation). Hougen has not shown that (1)

9  he is at high risk to become severely ill if he contracts COVID-19, (2) his facility is unequipped to

10  provide appropriate medical treatment if he does get sick, or (3) he faces guaranteed superior care and

11  lesser risk of infection outside custody, given the parameters of his suggested release conditions.

12  Hougen has not therefore shown that release is necessary to protect his life.

13        **1.**    <u>**Hougen is not particularly vulnerable to COVID-19**</u>

14        Courts have generally recognized that "it is a rare case in which health conditions present an

15  'exceptional reason'" to allow for release where detention would otherwise be warranted. *See, e.g.*,

16  *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (collecting cases). Hougen does not

17  establish an evidentiary basis to conclude that he is at high risk of getting very sick or dying from

18  COVID-19 based on one of the CDC's defined health conditions triggering substantially increased risk.

19  *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

20  conditions.html. Hougen now claims in his Motion that he has liver disease and is

21  immunocompromised, however he did not report these conditions to Pretrial Services at the time of his

22  bail interview, nor does he presently submit any medical records or official diagnoses to corroborate his

23  claims. *See* Pretrial Services Report dated November 4, 2020, at page 2. Furthermore, the CDC's

24  website indicates that only individuals immunocompromised as a result of blood or bone marrow

25  transfusions, organ transplants, HIV, or use of corticosteroids or other immune weakening medicines

26  *might* be a higher risk of increased COVID-19 morbidity. *See* https://www.cdc.gov/coronavirus/2019-

27  ncov/need-extra-precautions/people-with-medical-conditions.html#immunocompromised-state.

28  Hougen's Motion does not indicate that his immunocompromised state resulted from any of those

OPP. TO MOTION FOR RECONSIDERATION

1   procedures, illnesses, or medicines.  *See* ECF No. 46 at 4.  And, as Hougen's criminal record makes

2   clear, his alleged frailty did not stop him from using narcotics, excessively consuming alcohol, or

3   committing several acts of violence over the last three years.

4         Hougen also claims that he has a higher risk of COVID-19 morbidity based on his alleged 25-

5   year history of smoking.  ECF No. 46 at 4.  This is yet another medical issue that was not reported to

6   Pretrial Services at the time of Hougen's interview.  That being said, the health risks associated with

7   smoking have been publicly known for well over 20 years.  Hougen accepted those risks when he chose

8   to smoke and that voluntary choice does not defeat this Court's prior findings that he is dangerous and a

9   risk of flight, especially where media accounts and public officials indicate that many infected with

10  COVID-19 are asymptomatic, or experience it as a cold or flu.  The CDC's guidance says that smokers

11  should either stop smoking or not resume smoking to lower their COVID-19 risk.  *See*

12  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

13  conditions.html#smoking.  His compliance with that directive can be reasonably assured at Santa Rita,

14  as smoking and tobacco products are prohibited on the premises, but may not be elsewhere.

15              **2.    Hougen's facility is equipped to provide appropriate medical care**

16        Currently, Hougen does not claim to be infected with COVID-19 and he makes no claim that he

17  was denied necessary medical treatment or care for exposure to COVID-19 or for any other medical

18  condition.  Nor can Hougen establish that should he contract COVID-19 while in custody, the facility

19  would be unable to administer constitutionally acceptable treatment.  *Cf. United States v. Kidder*, 869

20  F.2d 1328, 1330–31 (9th Cir. 1989) (to prevail on Eighth Amendment claim regarding avoiding prison

21  due to medical condition, defendant "must show that *no* constitutionally acceptable treatment can be

22  provided while he is imprisoned" and collecting cases).  Santa Rita Jail has demonstrated its ability to

23  care for sick inmates, in that nearly all of the 485 inmates who previously tested positive for COVID-19

24  have since fully recovered and none have died.  *See*

25  https://www.alamedacountysheriff.org/admin_covid19.php.  Moreover, one district judge recently

26  reviewed the efforts of the California Department of Corrections and Rehabilitation's efforts to prevent

27  further spread of COVID-19 in California state prisons and "conclude[d] without difficulty that [the

28  measures taken by the State] ha[ve] been reasonable."  *Plata v. Newsom et al.*, No. 01-CV-01351 JST,

OPP. TO MOTION FOR RECONSIDERATION

1    ECF No. 3291 at 14 (N.D. Cal. Apr. 17, 2020) (finding California's efforts to combat COVID-19 in its

2    jails did not constitute a constitutional violation of the Eighth Amendment).

3           Santa Rita Jail is following CDC Guidance for correctional institutions and enacting social

4    distancing measures to the extent possible.[3]  Santa Rita Jail has also enacted extensive measures to

5    prevent the spread of COVID-19, including specific quarantine and isolation protocols.  It was inspected

6    by the Alameda County Public Health Department, has been monitored by outside consultants since

7    June 2020, and publicly posts the results of random compliance checks on its COVID update website.[4]

8    In denying Eighth Amendment violation claims raised by inmates in California jails, one judge in this

9    district reviewed these extensive measures and concluded:  "Defendants have also taken steps to reduce

10   the prison population and implemented a number of policies and practices that comply with the CDC's

11   recommendations. It would be difficult to conclude that such responses are not 'reasonable measures to

12   abate' the risk of COVID-19."  *See Plata*, No. 01-CV-01351-JST, ECF No. 3291 at 12.

13          In accordance with its COVID-19 Outbreak Control Plan, Santa Rita Jail has assigned each

14   inmate to a color-designated group to classify their risk to COVID-19.  *See* Santa Rita Jail COVID-19

15   Outbreak Control Plan at 4, *available at*

16   https://alamedacountysheriff.org/files/COVIDPlan08182020.pdf.  New arrivals to Santa Rita Jail are

17   segregated into the appropriate classification prior to any housing assignment.  *See id*.  There are four

18   groups:

19          • **Green** – asymptomatic inmates with no known exposure risk.  Housed per classification
20            with no restrictions.

21          • **Yellow** – asymptomatic but with known exposure risk.  Housed in isolation cell for 14
22            days, or cohorted with another inmate in the yellow category.

23          • **Orange** – inmates who fit objective criteria for vulnerability to risk (age 65 or older and
24            age 50 and older with certain underlying conditions).  Housed in vulnerable housing.

25

---

26   [3]  CDC Guidance for Correctional & Detention Facilities can be found here:
     https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-
     detention.html.  Santa Rita Jail is providing the Court with regular updates as to the conditions and
27   response to COVID-19, in *Babu et al v. Ahern et al*, 18-CV-7677 (N.D. Cal.), a class action civil lawsuit
     pending in the Northern District of California before Magistrate Judge Nathanael Cousins.

28   [4]  *See* https://www.alamedacountysheriff.org/admin_covid19.php (Additional COVID-19 Info Links).

OPP. TO MOTION FOR RECONSIDERATION

Inmates housed in vulnerable housing are checked up on daily by medical staff.

- **Red** – symptomatic inmates.  Any inmate with symptoms will be tested pursuant to CDC protocols.  The Santa Rita medical staff provide care to such inmates in a designated outpatient ward.

*Id.*  Santa Rita Jail continues to screen all new arrestees prior to intake and makes regular checks of the prisoner population for symptoms of infection.  *Id.* at 4, 6-8.  The jail has also regulated contact visits with persons outside the jail as a precautionary measure in accordance with social distancing guidance from federal, state, and local authorities.  *Id.* at 9.

As of January 22, 2021, Santa Rita Jail houses 2,134 inmates.  *See* https://www.alamedacountysheriff.org/admin_covid19.php.  The jail reports that 54 inmates have recently tested positive for COVID-19.  *Id.*  46 of the 54 inmates with positive COVID tests are asymptomatic.  *Id.*  All of them are stable and recovering under the institutional care of the jail.  *Id.*  As one judge recently found true for all California prisons—including Santa Rita Jail—"[c]learly Defendants [California officials] are trying, very hard, to protect inmates against the virus and to treat those who have contracted it.  The record simply does not support any suggestion that Defendants have turned the kind of blind eye and deaf ear to a known problem that would indicate 'total unconcern' for inmates' welfare . . . the actions of Defendants here in face of the COVID-19 outbreak easily pass constitutional muster."  *Plata*, No. 01-cv-01351-JST, ECF No. 3291 at 14 (quoting *Money v. Pritzker*, 2020 WL 1820660, at *18 (N.D. Ill. Apr. 10, 2020)).  Moreover, the random compliance checks at Santa Rita Jail by the third party monitor have been generally complimentary of the efforts of Santa Rita staff.  While noting some areas for improvement, the most recent report (filed on December 31, 2020) commends staff for a mostly "excellent job at keeping the COVID-19 virus at bay and out of SRJ."  *See* Mike Brady, *November 6, 2020 COVID-19 Follow-Up Spot Check of the Santa Rita Jail Facility by the Joint Neutral Corrections Operations and COVID-19 Expert*, at 13, *available at* https://alamedacountysheriff.org/files/SabotSRJ11062020.pdf.

### 3.   Hougen's proposed release plan does not guarantee a lesser risk of infection

Finally, Hougen proposes his release to an in-patient drug treatment center, effectively trading one institutional setting for another.  It is unclear what, if any, additional protection from the virus

Hougen will enjoy by living at a residential treatment center filled with addicts constantly revolving into and out of the community.  While Santa Rita can ensure that Hougen will be promptly quarantined and medically treated should he actually become sick, there is no such assurance if Hougen is released to the treatment center or elsewhere, and the government has seen no evidence that the quality of his care would exceed that offered by Santa Rita—especially since community hospitals throughout California are severely overburdened by recent surges in COVID-19 cases.[5]

## IV.    CONCLUSION

The Court has already found Hougen to be a flight risk and a danger to the community.  COVID-19 does not affect that determination.  Nor has Hougen demonstrated that, in light of COVID-19, release is necessary for him to prepare his defense or for any other compelling reason.  Accordingly, the Court should deny Hougen's Motion for Reconsideration and deny his request for release.

DATED:  January 22, 2021

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____/s/_____
MARISSA HARRIS
Assistant United States Attorney

MICHAEL J. SONGER
Trial Attorney, Civil Right Division

[5] See https://www.sfchronicle.com/bayarea/article/California-opens-vaccinations-to-everyone-65-and-15868157.php (noting surge in COVID-19 cases in California and widespread lack of ICU capacity).

OPP. TO MOTION FOR RECONSIDERATION

13