UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| USA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>OLE HOUGEN,<br><br>　　　　　Defendant. | Case No.  5:20-cr-00432-EJD-1<br><br>**ORDER DENYING MOTION TO SUPPRESS WITNESS STATEMENTS OR DISMISS INDICTMENT**<br><br>Re: Dkt. No. 68 |

On November 17, 2020, Ole Hougen was indicted on one count of committing a hate crime in violation of 18 U.S.C. Section 249(a)(1). Dkt. No. 13. On February 24, 2021, Hougen filed the current motion to suppress witness statements and related evidence, or, alternatively, to dismiss the indictment. Amended Motion to Dismiss [to Suppress Witness Statements or Dismiss Indictment, in Light of Fifth Amendment Due Process Violations Committed by Law Enforcement], Dkt. No. 68 ("Motion"). The Government filed an opposition, Dkt. No. 85 ("Opposition," "Opp'n") and Hougen filed a reply, Dkt. No. 108 ("Reply"). For the reasons given below, the Court **DENIES** the motion.

I.      **Background**

According to the Motion, on or about July 5, 2020, Hougen was involved in a physical and verbal altercation with S.B. at a public intersection in Santa Cruz, CA. *See* Motion at 1–8. This altercation gave rise to the hate crime charge now brought against Hougen. *See id*.

Santa Cruz Police Department ("SCPD") officers arrived at the scene and conducted interviews with witnesses. *See id*. In the Motion, Hougen highlights three incidents that occurred

United States District Court<br>Northern District of California

as police officers carried out these interviews. *See id*. Hougen also highlights a separate incident when an FBI agent was having a phone conversation with one of the witnesses of Hougen's alleged hate crime. *See id*. These incidents are described further below.

Hougen argues that the cited conduct of the police officers violated his Fifth Amendment Due Process rights to a fair trial. *See id*. at 1. Specifically, Hougen argues that the SCPD engaged in "leading, biased, and improperly suggestive questioning . . . of witnesses, including the alleged victim, giving rise to a substantial likelihood of tainted, false, and misleading testimony." *Id*. at 1. Hougen argues that the Court should suppress certain "tainted" portions of the witness interviews, as well as any evidence obtained therefrom. *See id*. at 10–21.

Hougen argues in the alternative that the Court should use its inherent supervisory authority to dismiss the indictment because "the government's conduct . . . caused substantial prejudice to the defendant and [was] flagrant in its disregard for the limits of appropriate professional conduct." *See id*. at 21–24. In support of this argument, Hougen cites the conduct of the police officers, and also a separate incident in which an FBI agent, who was investigating the hate crime allegation, acted in a way that was "willfully blind" to a victim-witness's misconduct, raising the possibility that evidence regarding the victim-witness's credibility was effectively suppressed. *See id*.

**A. First Highlighted Incident – C.S.'s Interview**

Hougen describes SCPD Officer Dewees's interview with C.S., who witnessed the altercation from a levee above the intersection. *See id*. at 2–3 (citing Exhibit A). During the interview, C.S. stated that he "didn't hear much," but that Hougen and S.B. "kept calling each other bitches." *Id*. at 2. At the end of the interview, Officer Dewees asked whether C.S. had heard "anything like racially motivated." *Id*. C.S. responded, "I just heard him say dumb nigger and fucking shit like shit like that. And he was like fuck you, dude. Like what'd I do to you? Like I didn't fucking do anything to you." *Id*. Officer Dewees then asked, "You think this guy approached that guy just because . . . of his race? Or was it a factor?" *Id*. C.S. responded, "Oh

United States District Court
Northern District of California

yeah . . . yeah, or if he, may have just been in a bad mood and that . . . he just threw that out there." *Id*. at 2–3. Officer Dewees responded, "But this guy brought up a whole bunch of racial stuff? . . . He say the N word? . . . Hard R?" C.S. responded, "Uh, sounded like it. I couldn't hear very well." *Id*.

Hougen argues that Officer Dewees's questioning of C.S. was biased, misleading, and improperly suggestive, with the result that C.S.'s statement became more focused on racial descriptions than it would have been otherwise. *Id*. at 14–15.

### B.  Second Highlighted Incident – W.C.'s Interview

Hougen describes Officer Garcia's interview with W.C. *Id*. at 3. S.B. was present during at least part of this interview. *See id*. Officer Garcia asked W.C. what she saw. W.C. responded, "Uh, well, I was just pulling up to make a right hand turn and I saw the guy [Hougen][1] trying to stab him [S.B.], um, and him just trying to walk through, and he [Hougen] was just coming after him with the knife." *Id*. Officer Garcia asked W.C. how many times Hougen attempted to stab S.B. *See id*. W.C. responded, "Oh, te-, I mean he was bobbing and weaving." *Id*. S.B. then interjected and said, "Probably like 7 and 8 [attempted stabbings]." *Id*. W.C. then said, "Yeah. Like 10. He was like . . ." *Id*. Officer Garcia then said, "Oh, remember, separate statements." *Id*.

Hougen argues that Officer Garcia's questioning of W.C. in the presence of S.B. was improper because it allowed for conferral between W.C. and S.B. during the interview, and because it allowed S.B. to hear W.C.'s accounting of the altercation before S.B. had been fully interviewed. *Id*. at 15–16.

### C.  Third Highlighted Incident – S.B.'s Interview

Hougen relates several parts of S.B.'s interview. *See id*. at 3–8. At certain points during this interview, Officers Forbus, Dewees, and Garcia conferred with each other regarding their understanding of the incident. *See id*. Hougen's description of the interview highlights portions of

---

[1] Throughout this order, where the Court interprets a pronoun, term, or phrase, the Court has supplied in brackets the name of the individual to whom the Court understands the term to be referring, or else the understood meaning of the term or phrase.

United States District Court
Northern District of California

the officers' questioning of S.B. as well as portions of the officers' conferrals with each other. *See id*. Two of the three cited parts of the interview involve the question of whether S.B. had a knife on his person during the altercation with Hougen, and, if so, whether he drew out the knife intentionally. *See id*.

Hougen cites an exchange between Officers Forbus and Dewees, regarding S.B. *See id*. at 4–5. Officer Forbus asked, "Is there a knife on him [S.B.]?" *Id*. at 4. Officer Dewees responded, "He didn't see any knife. I haven't searched him or anything." *Id*. Later during this exchange, Officer Forbus said, "As long as he doesn't have a knife, we can corroborate the fact it's not self-defense [i.e., we can corroborate the fact that Hougen's alleged attack against S.B. was not made in self-defense]." *Id*. Shortly after this exchange, Officer Forbus also stated to at least one other officer, "Okay. So as long as we can corroborate that he [S.B.] was the victim, he was the suspect and that guy was the defendant." *Id*. at 5. Officer Forbus went on to state, "So we have him, RP, and a witness saying that S[]'s the victim. . . . So let's make sure we just clean that part up. . . . So that way there's no questions at all that, uh. . . ." *Id*. at 5–6.

Hougen cites an exchange during S.B.'s interview when Officer Forbus asked S.B., "[D]id you ever reach for that knife [the knife that was on S.B.'s person] at any point?" *Id*. at 6. S.B. responded that he did not reach for his knife during the altercation because his knife had fallen to the ground during the altercation. *See id*. After S.B. said "It fell on the ground while, during the whole thing that happened," *id*., Officer Forbus responded, "Perfect." *Id*. Officer Forbus then asked the following: "So what I'm trying to do is, is understand, and I have a good idea of what happened, is you know I, it sounds like you were attacked. What I do is gotta make sure that during this process that a if this happened so rapidly that you weren't able to grab your knife in defense, it fell out. Um, I don't want him to claim that you pulled a knife on him if you didn't. And I don't have anyone saying that, but I just need you to kinda walk us through it." *Id*. at 6.

Hougen cites another exchange that occurred later during S.B.'s interview. Officer Forbus asked, "So the only time it [the knife] was in your hands is when you picked it up and put it back

United States District Court
Northern District of California

[in its holster][?]" *Id*. at 7. S.B. responded, "Yes." *Id*. S.B. also said, "And I admit the knife was in my hand like this for a second. . . ." *Id*. Officer Forbus said, "Okay. But you're never charging him, you're never yelling anything, you just put it back in." *Id*. S.B. responded, "I was yell-, I was yelling at him, but I didn't charge at him with the knife, no." *Id*. Officer Forbus responded, "Okay. Gotcha. So he never, in his experience, he, he never would assume that you were trying to stab him 'cause you put it away?" *Id*. S.B. responded, "Not that I . . . think no." *Id*. S.B. later said that he put his knife away because he wanted to avoid stabbing someone. *See id*. Officer Forbus responded, "[I]t's a good decision. . . . Obviously worked out [for] the best. . . . He goes to jail. You know, we're gonna get you some resources and stuff." *Id*.

In sum, Hougen argues that "the police questioning with regard to S.B. was intended to ensure that S.B. would endorse the preferred narrative in which (1) race was the cause of Mr. Hougen's conduct; (2) S.B. did not draw his weapon, but merely picked it up off the ground when it fell out of the holster[;] and (3) Mr. Hougen was not acting in self-defense." *See id*. at 16–19.

### D. FBI Agent Green's Telephone Conversation with S.B.

Hougen also cites a separate incident that occurred on September 1, 2020. *See id*. at 8. S.B. had previously expressed to FBI Agent Green that he had doubts about his ability to act as a witness in the trial against Hougen due to S.B.'s involvement with criminal activity. *See id*. In the phone call, S.B. "began to tell [Agent Green] about unspecific criminal activity in which he was involved," *id*., and Agent Green hung up before S.B. could continue speaking, *see id*. Later on September 1, S.B. texted Agent Green that "he was getting into 's***' and couldn't be cooperating." *Id*.

Hougen argues that Agent Green was willfully blind to evidence potentially relevant to a witness's credibility. *See id*. at 22–24. Hougen argues that Agent Green avoided hearing what S.B. had to say in order to avoid *Giglio* obligations to share with the defense information that she learned from S.B. *See id*. Hougen argues that this willful blindness further indicates that the

United States District Court
Northern District of California

1    Government has conducted its investigation against him in a way that now prevents him from

2    receiving a fair trial. *See id.*

3    **II.     Legal Standard**

4            "A district court may dismiss an indictment on the ground of outrageous government

5    conduct if the conduct amounts to a due process violation." *United States v. Barrera-Moreno*, 951

6    F.2d 1089, 1091 (9th Cir. 1991) (citations omitted). "If the conduct does not rise to the level of a

7    due process violation, the court may nonetheless dismiss under its supervisory powers." *Id*. "These

8    powers may be exercised for three reasons: to remedy a constitutional or statutory violation; to

9    protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly

10   before a jury; or to deter future illegal conduct." *Id*.

11          "[T]he [dismissal on due process grounds] defense applies only to conduct which is so

12   grossly shocking and so outrageous as to violate the universal sense of justice." *United States v.*

13   *Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (internal citations omitted).

14          "To justify [the] extreme remedy [of dismissal on supervisory authority grounds], the

15   government's conduct must have caused substantial prejudice to the defendant and been flagrant in

16   its disregard for the limits of appropriate professional conduct." *United States v. Lopez*, 4 F.3d

17   1455, 1464 (9th Cir. 1993). "Dismissal under the court's supervisory powers for prosecutorial

18   misconduct requires (1) flagrant misbehavior and (2) substantial prejudice." *United States v.*

19   *Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993).

20                                                    ***

21          "An identification infected by improper police influence . . . is not automatically excluded

22   [from a trial]." *Perry v. New Hampshire*, 565 U.S. 228, 232, 132 S. Ct. 716, 720, 181 L. Ed. 2d

23   694 (2012). "Instead, the trial judge must screen the evidence for reliability pretrial." *Id*. "If there

24   is 'a very substantial likelihood of irreparable misidentification,' the judge must disallow

25   presentation of the evidence at trial." *Id*. (citing *Simmons v. United States,* 390 U.S. 377, 384, 88

26   S.Ct. 967, 19 L.Ed.2d 1247 (1968)). "But if the indicia of reliability are strong enough to outweigh

27   Case No.: 5:20-cr-00432-EJD-1

28   ORDER DENYING MOTION TO SUPPRESS WITNESS STATEMENTS OR DISMISS
     INDICTMENT

the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id.*

## III.   Discussion

### A.   Dismissal of Indictment

The Court first addresses the arguments to dismiss the indictment, as these arguments may make moot the arguments to suppress witness statements and related evidence.

Hougen raises two potential grounds for the Court to dismiss Hougen's indictment: the grounds of due process, and the grounds of supervisory authority. *See id.* at 1. Hougen's arguments focus on the latter. *See id.* at 21–24.

#### 1.   Due Process Grounds

Hougen mentions but does not develop an argument that the Court should dismiss the indictment on due process grounds. *See, e.g.*, *id.* at 1, 24. Hougen also does not cite any case law in support of such an argument. The Government's opposition nevertheless focuses on this argument, and repeatedly analyzes the law enforcement misconduct alleged in the Motion under the high standard of *Restrepo. See, e.g.*, Opp'n at 8 ("Officer Garcia's on-scene interview of eyewitness W.C. was not 'so grossly shocking and so outrageous as to violate the universal sense of justice.'"). The Government refers to the following types of misconduct as examples that meet the *Restrepo* standard of outrageous conduct: the use of racial discrimination in selecting a grand jury, the exclusion of women from a grand jury, and the allowing of "a defendant to stand trial on an indictment which it knows to be based on perjured testimony material to the return of that indictment." *Id.* at 7 (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 257, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974)). The Court agrees that the alleged law enforcement misconduct in the present case does not rise to the level of due process violations described in *Restrepo*. The Court therefore declines to dismiss the indictment on due process grounds.

United States District Court
Northern District of California

2.  **Supervisory Authority Grounds**

Hougen's primary argument for dismissal is that the "Court has inherent supervisory authority to dismiss [an] indictment where 'the government's conduct . . . caused substantial prejudice to the defendant and [was] flagrant in its disregard for the limits of appropriate professional conduct.'" Motion at 21–22 (citing *Lopez*, 4 F.3d at 1464). In support of this argument, Hougen cites the three incidents of alleged SCPD misconduct described above, as well as the incident of alleged FBI misconduct described above. *See id*. Hougen cites *Lopez*, 4 F.3d at 1464 (holding that prosecutor's violation of ethical rule did not require dismissal of indictment pursuant to supervisory power where defendant was not prejudiced), as an example of a case where a court declined to use its supervisory authority to dismiss an indictment. *See id*. at 22 (using Hougen's parenthetical summary of the case verbatim). Hougen cites *United States v. Marshank*, 777 F.Supp. 1507, 1519–20 (N.D. Cal. 1991) (ordering dismissal of indictment where defendant's attorney served as unpaid informant for government by providing government with confidential client information), as an example of a case where the court dismissed an indictment on supervisory authority grounds. *See id*. (using Hougen's parenthetical summary of the case verbatim).

In response, the Government argues that neither the "substantial prejudice" nor the "flagrant . . . disregard for . . . professional conduct" prongs of the supervisory authority argument are met. *See* Opp'n at 7–8, 14. The Government argues that the cited behavior exhibited by law enforcement, although imperfect, was within the bounds of professional conduct, especially considering the challenges of the conducting interviews at the site of the altercation. *See, e.g.*, *id*. at 9. The Government points out that Hougen will have the ability at trial to cross examine witnesses, attack witness credibility, and assert various defenses. *See, e.g.*, *id*. at 14. The Government also argues that the federal investigation of the hate crime is separate from the investigation conducted by the SCPD. *See, e.g.*, *id*. at 9.

United States District Court
Northern District of California

### a. C.S.'s Interview

The Court does not find that Officer Dewees acted with a "flagrant . . . disregard for . . . professional conduct" when he asked questions about race during the interview with C.S. *See* Motion at 2–3 ("You think this guy approached that guy just because . . . of his race? Or was it a factor?" "But this guy brought up a whole bunch of racial stuff? . . . He say the N word? . . . Hard R?"). These questions were not unreasonably suggestive, especially given that C.S. had earlier suggested that Hougen and S.B. had exchanged verbal insults. *See id*. at 2. In any case, this kind of questioning is distinct from *Marshank* (ordering dismissal of indictment where defendant's attorney served as unpaid informant for government by providing government with confidential client information), the only case cited by Hougen as an example where a court dismissed an indictment on supervisory authority grounds. *See id*. at 22. Officer Dewees's conduct also did not cause "substantial prejudice." Hougen retains the ability to probe the relevant witness statements and evidence derived therefrom by cross examining witnesses, by attacking witnesses' credibility, and by making various defenses.

### b. W.C.'s Interview

The Court does not find that Officer Garcia acted with a "flagrant . . . disregard for . . . professional conduct" when the officer interviewed W.C. with S.B. present. *See id*. at 3. While this interview should have been conducted with W.C. having been separated from S.B., there is no apparent flagrant disregard for standards comparable to *Marshank*. Even if there had been, Officer Garcia's conduct did not cause "substantial prejudice." The alleged conferral between W.C. and S.B. is minimal and involves an issue that is not particularly crucial to the investigation (how many times Hougen attempted to stab S.B., according to W.C.; S.B. suggested seven or eight times immediately before W.C. suggested ten times). *See id*. Hougen is able to probe the relevant witness statements and evidence derived therefrom by cross examining witnesses, by attacking witnesses' credibility, and by making various defenses.

### c.  S.B.'s Interview

Officer Forbus's communication with other officers, and his leading questioning of and affirming responses to S.B., do suggest that Officer Forbus was at least marginally pre-disposed to identify a certain narrative during his investigation. *See id.* at 3–8. But the officer's conduct nevertheless remains distinct from the "flagrant . . . disregard for . . . professional conduct" standard shown in *Marshank*. Officer Forbus's conduct also did not cause "substantial prejudice." Hougen retains the ability to probe the relevant witness statements and evidence derived therefrom by cross examining witnesses, by attacking witnesses' credibility, and by making various defenses.

### d.  FBI Agent Green's Telephone Conversation with S.B.

Regarding Agent Green's communication with S.B., Hougen cites no case law supporting the argument that, in a situation where a witness states an intention to divulge his or her own criminal activity to a law enforcement agent, the law enforcement agent's refusal to hear such information amounts to a "flagrant . . . disregard for . . . professional conduct." *See id.* at 21–24. Moreover, after Agent Green hung up on S.B. during the cited phone conversation, S.B. could have and did text Agent Green with further information. *See id.* at 8. The Government documented and disclosed the September 1, 2020, phone call, as well as the texting between Agent Green and S.B., and S.B.'s criminal record through February 26, 2021. *See* Opp'n at 12. Agent Green's hanging up on S.B. during the September 1, 2020, phone call did not cause the "substantial prejudice" required to dismiss an indictment on the grounds of the Court's supervisory authority. Hougen retains the ability to cross examine S.B., attack S.B.'s credibility, and make various defenses with regard to S.B.'s testimony.

\*\*\*

Even when the separate instances of law enforcement conduct cited by Hougen are considered together as a whole, this conduct does not meet the required standard for dismissing an indictment on the grounds of the Court's supervisory authority.

Case No.: 5:20-cr-00432-EJD-1
ORDER DENYING MOTION TO SUPPRESS WITNESS STATEMENTS OR DISMISS INDICTMENT

United States District Court
Northern District of California

1    For the reasons given above, the Court declines to dismiss the indictment on supervisory

2    authority grounds.

3    ***

4    For the reasons given above, the Court **DENIES** the motion to dismiss.

5    **B. Suppression of "Tainted" Portions of Witness Statements and Evidence Arising**

6    **Therefrom**

7    Hougen argues that the Court should suppress the "tainted" witness statements cited above

8    as well as any evidence derived therefrom. *See* Motion at 10–14. Hougen cites *Perry* for the notion

9    that "[if] there is a very substantial likelihood of irreparable misidentification, the judge must

10   disallow presentation of the evidence at trial." 565 U.S. at 232 (internal citation omitted). Hougen

11   also relies on *Foster v. California*, 394 U.S. 440, 442 n.2, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

12   Motion at 11 ("[A]n identification procedure that is unnecessarily suggestive and conducive to

13   irreparable mistaken identity violates due process of law, rendering the identification

14   constitutionally inadmissible as a matter of law." (citing *Foster*, 394 U.S. at 442)).

15   *Perry* and *Foster* address instances of alleged government misconduct involving pretrial

16   identification procedures. *See* 565 U.S. at 232; 394 U.S. at 442. Hougen argues that the application

17   of *Perry* and *Foster* extend beyond identification procedures and can reach situations of

18   "suggestive and overreaching police questioning." Motion at 12. In support of this notion, Hougen

19   cites *Weimer v. County of Kern*, No. 1:06-CV-00735, 2007 WL 14353, at *3 (E.D. Cal. Jan. 3,

20   2007), *Bennett v. R&L Carriers Shared Services*, 744 F.Supp.2d 494, 515 (E.D. Va. 2010), *aff'd*,

21   492 F.App'x 315 (4th Cir. 2012), and *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 88

22   L.Ed.2d 405 (1985). While these cases indicate that the admission of certain witness statements

23   can amount to due process violations, the cases do not show clear support for the argument that

24   the application of *Perry* and *Foster* can extend beyond pretrial identification procedures.

25   Moreover, the tainting witness statements cited in *Weimer* and *Bennett* involve more extreme

26   situations of unfairness than are present here. In *Weimer*, a defendant was convicted on child

27   Case No.: 5:20-cr-00432-EJD-1

28   ORDER DENYING MOTION TO SUPPRESS WITNESS STATEMENTS OR DISMISS
     INDICTMENT

molestation charges, the crime was "late-reported," the "victim's testimony was the sole basis for conviction and was uncorroborated by any independent evidence introduced by the prosecution," and "[e]ach victim suffered from material credibility problems." 2007 WL 14353, at *1–3. A court determined that the testimony made against the defendant was "unreliable and so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. at *1 (internal citation omitted). In *Bennett*, an "[informant] did not implicate [the suspect] until [the investigator] effectively fed [the informant] the information that he had received from [another informant]." 744 F.Supp.2d at 515. Hougen cites *Miller* only for the proposition that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller*, 474 U.S. at 109. The Court sees insufficient reason to find that such offensive interrogation techniques are present in the case at hand.

The Government argues that *Perry* and *Foster* are inapplicable here because they only apply to identification procedures. Opp'n at 14. The Government alternatively argues that even if *Perry* is applied to the SCPD interviews, the suppression of the witness statements is not required, because "law enforcement committed no misconduct and there is no 'substantial likelihood' of irreparable prejudice to the defendant." *Id*. (citing *Perry*, 565 U.S. at 232). Without deciding that *Perry* provides the correct framework for analyzing law enforcement questioning procedures, the Court agrees that, if the *Perry* analysis framework is applied to the law enforcement questioning in the present case, the requirements for suppression of the witness statements and evidence derived therefrom are not met. The Court relies on the same reasoning given above as to why the Court finds no "substantial prejudice" resulting from the officers' interviews. *See supra*.

The Court therefore **DENIES** the motion to suppress witness statements and any evidence derived therefrom.

IV.     **Conclusion**

For the reasons given above, and also for the reasons given at the hearing where this motion was discussed, the Court **DENIES** Hougen's motion to suppress witness statements or, alternatively, to dismiss the indictment.

**IT IS SO ORDERED.**

Dated: March 30, 2021

_____
EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

Case No.: 5:20-cr-00432-EJD-1
ORDER DENYING MOTION TO SUPPRESS WITNESS STATEMENTS OR DISMISS INDICTMENT